GOSSEN COMPANY, A DIVISION OF UNITED STATES GYPSUM COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 81–1074.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1981.

Decided Oct. 18, 1983.

---

Clarence O. Redman, Keck Mahin & Cate, Chicago, Ill., for petitioner.

Michael Messitte, Elliott Moore, N.L.R.B., Washington, D.C., for respondent.

Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and BROWN, Senior District Judge.[*]

FAIRCHILD, Senior Circuit Judge.

Gossen Company maintains establishments in Milwaukee and Glendale, Wisconsin, where it produces plastic moldings. In 1978 and 1979 there were efforts to organize the Company's production, maintenance and warehouse employees. The union lost an election in March, 1978. In March, 1979 a new campaign began, and an election was held June 14 and 15, 1979. There were 70 votes against the union, 69 in favor, and three challenged ballots.

The unfair labor practices alleged in the proceeding arose during and shortly after the 1979 campaign. A number of allegations were dismissed by the ALJ. He found, however, that the Company had engaged in unfair labor practices by announcing a suspension of its merit evaluation and wage increase system and by discriminatory discharges of four employees and warnings of two. The Board additionally found certain conversations to have been coercive and therefore unfair labor practices under § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976). *See Gossen Company,* 254 N.L.R.B. 339 (1981).

The Company vigorously expressed views in opposition to the selection of the union as representative. It was not found to have exceeded its rights in such expression, but its active efforts at persuasion are part of the background of the proceeding.

*I. Suspension of Merit Wage Increases*

The Company had a policy of reviewing the performance of employees and granting merit increases. The ALJ found that

[m]erit increases are based upon subjective periodic evaluations of employee performance and upon economic conditions.... In practice, it appears merit increases were granted at generally regular intervals within the first 90 days of employment. Thereafter, there was no regularity to such increases.... I find the merit wage increase system remained an active program systematically, albeit not with regularity, applied to reward worthy employees for good job performance.

Thus there was regular review during an employee's first 90 days, although the amount of increase was discretionary. After the first 90 days both the timing of the review and the amount of increase were discretionary.

Merit increases, as well as across the board increases, were suspended during the organizing campaign. In response to questions about raises, management people answered to the effect that wages were frozen during the union campaign, and in several instances explained that increases could be considered bribery.

The ALJ found that suspension of the merit review system and blaming the union for the suspension constituted an unfair labor practice. The Company was ordered to reinstate its system and implement it retroactively to March, 1979.

It is recognized that an employer's change in the *status quo* during an organization campaign, either favorably or unfavorably to employees, may constitute an interference with exercise of protected rights. The problem here is the content of the *status quo*.

The Board argues that the Company had established a pattern of merit wage increases such that

increases at approximately the times and in approximately the amounts suggested by past practice would be expected by employees and would be viewed as "business as usual" rather than an inducement to abandon the union. Conversely, the failure to pay any wage increases whatsoever would be unexpected and would like-

* Senior District Judge Wesley E. Brown of the District of Kansas sitting by designation.

ly be viewed as a deviation from past practice attributable to the union.

The Company points to the risk that a wage increase while an election is pending may be found by the Board to have been granted for the purpose of inducing recipients to vote against the union. The risk is minimal where the employer can show the increase was an implementation of an established practice. But the more highly discretionary the past actions, the more difficult it becomes to establish a pattern, and to demonstrate that there has been no change from the *status quo.*

The Fifth Circuit dealt with a problem in this area in *N.L.R.B. v. Dothan Eagle, Inc.,* 434 F.2d 93 (5th Cir.1970). The court said,

> The cases make it crystal clear that the vice involved in both the unlawful increase situation and the unlawful refusal to increase situation is that the employer has *changed* the existing conditions of employment. It is this *change* which is prohibited and which forms the basis of the unfair labor practice charge.

434 F.2d at 98 (emphasis in original).

The court went on to determine that in the situation before it the periodic increase had become such an integral part of the structure of compensation that it was unlawful to withhold them during the union campaign. It is true, of course, that the timing of the increases considered by the Fifth Circuit in *Dothan Eagle* was regular and the amount varied only from ten to fifteen cents per hour.

In two decisions the Second Circuit has been highly sensitive to the employer's dilemma where past wage practices were not equally definitive. In the first, *N.L.R.B. v. Dorn's Transportation Company,* 405 F.2d 706 (2d Cir.1969), the court held that withholding an increase during organizational efforts was not an unfair labor practice. As to an established pattern, there was only a reference to the Company's ordinarily reviewing salary increases during the latter part of each year.

In *J.J. Newberry Co. v. N.L.R.B.,* 442 F.2d 897 (2d Cir.1971), the pattern shown was more specific. After the first 30 days an employee was reviewed approximately every six months, although the timing might vary by several months. An employee could expect an increase or an explanation why he wasn't getting one. The increases were not uniform. Relying on *Dorn's,* the court held that where

> wage reviews are fairly regular but the wage increases are subjective and discretionary . . . we should not enforce the Board's order absent a finding . . . that the company was illegally motivated and did not act in a "good faith effort to conform to the requirements of the law."

442 F.2d at 900 (quoting *Dorn's,* 405 F.2d at 715).

The Second Circuit appeared to be concerned that an employer who grants an increase believing it to be consistent with the past practice faces a risk of misinterpretation by the Board where he cannot establish with certainty a pattern of past practice which includes regularity of timing and objective standards for determining the amount. It deemed the risk unacceptable where the past practice was discretionary.

The Board asserts that "to comply with his statutory obligations during a union campaign, an employer need only continue to operate his business as if the union were not on the scene." Doubtless the Board is confident of its ability to determine true consistency, but there is nevertheless some reason for concern, considering the subjective nature of the merit increase decision, and the deference which must be shown to factfinding by the Board.

The Tenth Circuit dealt with this problem in *Plasticrafts, Inc. v. N.L.R.B.,* 586 F.2d 185 (10th Cir.1978). The facts before the court apparently permitted more completely objective determination of the regularity of past practices than was true in *Newberry,* or, with respect to amount, in the case before us. The court indicated a test, however, which would depend "not only on the existence of an established practice but also on whether it would be clearly apparent to an objectively reasonable employer." 586 F.2d at 188.

■ In the case before us wage review during the first 90 days of employment was regular and universal although the amount of any increase was discretionary. We think that under the *Plasticrafts* test, the existence of an established practice during the first 90 days would be clearly apparent to an objectively reasonable employer. And in the absence of independent evidence of improper motivation, we see no substantial risk that decisions on merit increases during the campaign within employees' first 90 days would later be found to interfere with a choice as to representation. Reviews and increases at later stages occurred, but were so highly discretionary that no real pattern was established.

Although the ALJ referred in his finding to the Company's "blaming" the union for the suspension, the relevant references by representatives of management to the union campaign were no more than a natural way of describing the period during which raises were suspended. They were comparable in substance to remarks not found to have interfered with protected rights in other decisions cited herein. We see no basis for the finding of a § 8(a)(3) unfair labor practice.

Accordingly, we will enforce paragraphs 1(a) and 2(c) and the relevant notice requirements of the Board's order only with respect to reviews and increases within the first 90 days of employment.

## II. Interrogation

■ The ALJ found no merit in a number of allegations that interrogations and comments were coercive and therefore were § 8(a)(1) unfair labor practices. In finding questions and remarks not coercive he relied upon the absence of threats and promises, on the "open and candid character of the election campaign," and what he described as its "casual nature" with a free flow of conversation between workers and supervisors.

One conversation was between employee Waubiness and supervisor Redzinski, and another between employee Bugni and Redzinski. Concerning these conversations the ALJ found:

Waubiness testified he had 10 conversations regarding the Union with Redzinski, Jeray and Ihlenfeld [all supervisors]. During one such conversation with Redzinski which occurred, according to Waubiness, at the end of March, Waubiness claimed Redzinski asked him "what I thought the Union could do for me." Waubiness responded better wages, insurance, and a healthier attitude toward employees by supervisors. Waubiness was wearing a union button at the time. Assuming the remark was made as stated, interrogation as to what employees expect to gain from a union is, on its face, uncoercive where unattended by threats of reprisal or promises of reward. *Whittaker Knitting Mills, Inc., Div. of Whittaker Corp.,* 207 NLRB 1019, 1022 [(1973)]. Waubiness' own version of this remark shows he already had declared himself a union supporter by wearing his union button. The above-quoted statement of Redzinski constitutes Waubiness' complete testimony upon the subject allegation. Thus, it is not asserted Redzinski coupled that remark with any explicit or implied threat or promise. In the free flow of discussion about unionization which clearly prevailed in the instant campaign, I do not find Redzinski's remark unlawful.

Bugni claimed that 6 weeks before the election Redzinski spoke to him at his work station. Observing Bugni wore a union button, Redzinski asked what it meant to him or why he was wearing it. Bugni testified he explained, and Redzinski responded he could accept and respect Bugni's views. That conversation then ended. As with Waubiness, Bugni's account provides no evidence Redzinski's comment was attended by any threat or promise. I conclude this conversation is within the purview of the *Whittaker* case, *supra.*

A three member panel of the Board, with one member dissenting, found these two instances of Redzinski's questioning coercive. The majority relied on a then recent decision, *PPG Industries, Inc.,* 251 N.L.R.B.

156 (1980), overruling earlier decisions, and finding that a supervisor's questions regarding union sympathies are coercive because they convey the employer's displeasure with union activity. Coercive impact was said not to be diminished by the employee's open union support or by the absence of threats. The majority made no comment on the free flow of candid discussion and the atmosphere of this campaign as emphasized by the ALJ. With all due respect for the Board's factfinding powers and expertise in these matters, *see Sioux Products, Inc. v. N.L.R.B.*, 684 F.2d 1251 (7th Cir.1982), we do not find substantial evidence in the light of this record to sustain its finding of coercion in these instances.

We deny enforcement of paragraph 1(e) of the order, and the relevant notice requirement.

### III. Discriminatory Discipline

The ALJ and Board found that four discharges and two disciplinary warnings were unlawfully motivated. The Company asserts that in each instance the discipline was imposed for valid cause. In some cases the ALJ found that the assigned cause was pretextual; in some, that although the cited cause had occurred, the employee's union activity was a substantial motivating factor.

As noted by the Board, the ALJ's decision preceded the Board's adoption of the *Wright Line* test for causation. *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980). In reaching the same ultimate findings, the Board applied *Wright Line* where called for. As we see it, the advent of *Wright Line* makes little difference in this case. In each instance where the ALJ found that union activity was a substantial motivating factor, notwithstanding facts which might have justified discipline, the ALJ focused upon and determined the improbability that the discipline would have been imposed on account of those facts. In our review we look to see whether there is substantial evidence in the light of the record to sustain the resulting findings. 29 U.S.C. § 160(e) (1976). *See*

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The ALJ's analysis is set out at length in his decision, *see* Appendix to *Gossen Company*, 254 N.L.R.B. 339, 355–71 (1981), and in our discussion of the several instances, we will avoid repetition so far as possible.

### A. Magee

■ Magee had been a leader in the 1978 organizing effort, and was again a leader in 1979. He was discharged April 30 at the height of the campaign and six weeks before the election which was expected to be and was very close. Although the threat reported by Stoller would have justified discharge, it was denied by Magee and not verified by alleged bystanders. The Company was aware of reasons to question Stoller's credibility, and there were facts to support the ALJ's conclusion that the employer's investigation was cursory, cavalier, shallow, and contrived. No reason was given in the notice of discharge. The ALJ properly could and did take into consideration the Company's effort at the hearing to show previous acts of misconduct by Magee. The ALJ concluded that these acts would surely have been recorded if they had happened. Magee had been employed ten years and his record was generally good.

We think the ALJ drew permissible inferences and that there was substantial evidence in the light of the record to support his finding that the Company's reliance on the Stoller report was a subterfuge to disguise a discriminatory discharge.

### B. Parr

■ Parr was an initiator of the union campaign and member of the organizing committee. His activity was known to the Company. He admitted running coins through an embosser so that an imprint was made on a plastic molding being produced. There was evidence that others, including supervisors, had been known to run foreign objects through an embosser. Production Superintendent Hoffman suspended Parr, and Parr apologized. Hoffman suggested that Parr submit the apology in writing.

The works manager, however, immediately discharged Parr for destruction of company property and violation of a safety rule. There was general talk in the plant to the effect that it was unfair to discharge Parr. When employee Engel stated that belief to a supervisor, the supervisor responded to the effect that someone other than Parr would not have been fired. Parr's discharge occurred May 23, about three weeks before the election.

The case is not strong, but we think there was the requisite substantial evidence to support the ALJ's finding that Parr's union activity was a substantial motivating factor in his discharge.

### C. White and Lavine

■ White and Lavine signed union authorization cards and wore union buttons, but neither was notable in union activities. Early in the campaign White had told a supervisor that he intended to vote against the union, but claimed to have told him in April he had changed his mind.

On August 8, White and Lavine were discharged for horseplay and unsafe conditions. A supervisor observed them in a water fight at a bubbler. (What is known in the Milwaukee area as a bubbler is elsewhere called a drinking fountain.) Water on the floor was said to cause a safety hazard.

The ALJ found that the real reason for the discharge of White was retaliation for announcing his change of mind and that the discharge of Lavine was merely incidental to accomplishing the unlawful discharge of White.

The discharges occurred almost two months after the election and four months after White's change of mind. The ALJ, after reviewing disciplinary records, found other horseplay and safety violations which did not result in discharge. Notwithstanding the arguable basis for questioning whether discipline was uniform, we conclude, in the light of all the circumstances, that there was not substantial evidence to support the finding that the discharges were discriminatory.

### D. Engel

■ Engel was one of the strongest union advocates. She had been an employee for 15 months with a clear record. Between April 16 and August 10, beginning coincidentally with her union activity, she was given eight warnings and was then placed on probation.

The actions cited in the warnings occurred. The ALJ found, however, that she was treated differently from other employees regarding her work errors. The supervisor who warned her reported she was "leading pack for the Union." The ALJ found that the warnings were given to interfere with and retaliate for her union activities. We conclude that this finding was supported by substantial evidence.

### E. Hartmann

■ On July 31, Hartmann received a warning for being out of his assigned work area, and taking unauthorized equipment from maintenance. The ALJ found the warning was motivated by anti-union considerations.

Hartmann had a good record. Shortly before the election he had signed and distributed two letters. Both were strongly anti-employer, and a supervisor made comments to him about the letters. The same supervisor had reported that Hartmann was the strongest union man in the Company. Hartmann admitted the infractions for which he was warned, but had an apparently plausible explanation for them. The ALJ found that Hartmann and other employees previously engaged in similar activity with relative impunity. The case is thin, but in the light of all the circumstances, we conclude there was substantial evidence to support the ALJ's finding of unlawful motivation.

We deny enforcement with respect to the discharge of White and Lavine, and grant it with respect to the other discharges and warnings.

ENFORCEMENT DENIED IN PART AND GRANTED IN PART.