**STOKELY–VAN CAMP, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 82–1131.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 21, 1983.
Decided Nov. 30, 1983.

Herbert C. Snyder, Jr., Barnes & Thornburg, Indianapolis, Ind., for petitioner.

Susan Williams, Elliott Moore, N.L.R.B., Washington, D.C., for respondent.

Before PELL, BAUER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Petitioner Stokely-Van Camp, Inc. (Stokely, or the Company) seeks review of an order of the National Labor Relations Board (Board), 259 N.L.R.B. No. 128 (1982), which found that Stokely had violated sections 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 151–169, by postponing vacations scheduled to begin during a strike. The Board cross-petitions for enforcement of its order. For the reasons set forth below, the Company's petition for review is granted, and the Board's petition for enforcement is denied.

## I.

Stokely operates a food processing plant and a can manufacturing plant in Indianapolis. The United Steelworkers of America, Local No. 1473 (the Union) is, and has been since 1971, the exclusive bargaining representative of the hourly-paid production, maintenance, and warehouse employees at the two plants.

The 1977–80 collective bargaining agreement expired on Friday, June 6, 1980. At a negotiating session on June 4th, the Union announced that an economic strike would begin at both plants at midnight on June 6th. Sometime on June 4th, James Spurgeon, Stokely's labor relations manager and chief negotiator, decided that all vacations scheduled to begin on or after June 9th would be rescheduled to be taken after the strike ended.[1] The Union was not notified of this decision, and individual workers learned of it only when they attempted to pick up advance vacation checks on June 6th. The strike was a violent one, and continued until August 25, 1980. No union members crossed the picket line, but supervisory personnel maintained some production during the strike. After the strike, all employees who had vacations scheduled to be taken during the strike period had an opportunity to reschedule their vacations.[2] They were paid for those vacations at the higher rate in effect under the new contract. Seventeen processing plant employees and sixty-five can plant employees were affected by the rescheduling policy, having received approval prior to June 4th for vacations due to begin between June 9th and August 25th. Amounts of one to four weeks vacation time (depending on the employee's length of service) were involved for each. .

On June 12, 1980, Earl Martin, a can plant employee who had been scheduled for two weeks vacation beginning June 9th, filed an unfair labor practice charge with the Board alleging that he and other employees had been discriminated against by Stokely's vacation rescheduling policy.[3] Martin apparently acted on his own initiative without discussing the charge with the Union. The Union never demanded vacation pay during the strike. The Board's Regional Director issued a complaint on July 18, 1980, charging Stokely with violation of sections 8(a)(1) and (3) of the National Labor Relations Act (the Act).[4]

As part of the strike settlement negotiated on August 21–22, 1980, the Union insisted on an amnesty clause. The Union

1. A paid vacation is earned in the anniversary year preceding that in which it is taken; it must be taken at some time during the year, but the timing is largely at the employee's option with the consent of management. Vacation times must be requested and approved two weeks in advance. Under the contract, the Union has no role in vacation scheduling, and management can reschedule vacations at any time as necessitated by production needs. Vacations traditionally begin on Monday, and are taken in whole week increments. A check for the entire vacation period is distributed to the employee on the payday immediately preceding the vacation. There is no provision in the collective bargaining agreement for vacation pay in lieu of time actually taken off on vacation.

2. Some employees were erroneously given their advance vacation pay on June 6th. The employee relations manager at the processing plant interpreted Spurgeon's June 4th instruction about rescheduling vacations to mean that although no new vacation checks were to be processed, those already written were to be distributed on schedule. Accordingly, the 19 employees scheduled for vacations beginning June 9th who came in on June 6th to collect their vacation checks were given them. These individuals of course did not need to have vacations rescheduled after the strike.

3. During the strike Martin decided to accept employment with a life insurance company, and became a paid agent on August 18, 1980. When the strike ended August 25th, Martin requested the two weeks vacation originally scheduled to begin during the strike. After this vacation, he requested and received one week sick leave. He then requested and received an additional three weeks paid vacation (to which he was presumably entitled, although for reasons that do not appear in the record). Having exhausted his vacation entitlement, Martin announced his resignation in early October. He is no longer a member of the Union. Mr. Martin clearly has no interest in the outcome of this proceeding.

4. Section 8(a)(5) was not cited in the complaint, and was first raised by the General Counsel in briefs filed with the Administrative Law Judge after the hearing on the complaint.

agreed to have Mr. Martin withdraw his charge,[5] and to withdraw the Union's own charge against Stokely of bargaining in bad faith. In return, Stokely agreed to dismiss a state court injunction against the strike violence, and its charge against the Union of bargaining in bad faith. The Union negotiator also asked for and received Spurgeon's assurance that all affected employees' vacations would be rescheduled. Both Stokely and the Union complied with these conditions.

Mr. Martin, however, was not amenable to withdrawing his charge. After the strike he twice telephoned Spurgeon and said that he would drop his charge as soon as he received all his vacation pay. In December, 1980, Spurgeon called Martin to ask why the charge had still not been withdrawn, and Martin said he had tried but "those people wouldn't let me."[6] This conversation ended with Martin's promise to discuss the matter with his union representative, but he never did so.

## II.

The case was tried before an administrative law judge (ALJ) on February 9, 1981. Mr. Spurgeon testified at the hearing that he had had three reasons for deciding on June 4th to reschedule vacations. First, he believed that the company had a contractual right to do so. Under the management rights and vacation clauses of the collective bargaining agreement, management had the right to control the production schedule, and to reschedule vacations as necessary without the consent of the Union (or, for that matter, of the affected worker). Spurgeon testified that all workers who chose not to join the strike would have been called to work. Second, strike vacation rescheduling was in accord with past policy. During a 1974 strike, employees had been given the option of paid vacation during the strike with unpaid time off afterwards, or a paid vacation after the strike. Before a threatened 1977 strike, a notice had been posted stating that all vacations would be rescheduled in the event of a strike. Spurgeon also testified that during a strike at another Stokely plant, with employees represented by the same union, the same policy of rescheduling strike period vacations had been followed. There had been no legal challenge to Stokely's policies in any of these cases, and no individual grievance over vacation rescheduling had been taken as far as arbitration. Third, Stokely took the position that a vacation meant time off from work, and that employees could not be scheduled for time off from work if they were not working. This view is consistent with the employee's contractual right to paid time off but not to vacation pay per se. The ALJ completely credited Mr. Spurgeon's testimony, and his statements about the contract and about past practice were supported by documentary evidence.

The ALJ also rejected the General Counsel's proffered evidence of antiunion animus. The General Counsel relied solely on two remarks made by supervisory personnel. First, on June 6th, Martin asked his plant superintendent why his vacation check was not forthcoming. According to Martin, the supervisor replied that "it was the Union's fault, because during negotiations, they had expressed the desire to go out on strike if the contract hadn't been settled by midnight." Second, a week later another employee asked the employee relations manager why he did not receive a check for his June 16th vacation, and was

---

**5.** Since Martin had filed an individual charge, he, not the Union, had the authority to withdraw it. The Union's international representative testified that as bargaining chairman he thought he had the exclusive right to bargain on behalf of all employees and could therefore promise that Martin would withdraw his charge. At the August 21 negotiating session, the union president similarly thought there would be no problem and was sure Martin would withdraw the charge. The Stokely negotiator, Spurgeon, testified that he assumed the Union was able to make a promise on Martin's behalf, and that he relied on that promise in concluding the negotiations.

**6.** The Regional Director has to approve requests for withdrawal, and approval is not automatic when the complaint is on behalf of others as well as the individual complainant. At the hearing Martin testified that he in fact never attempted to withdraw his charge, and that no one at the NLRB had refused to allow withdrawal.

told that vacation checks were canceled because "you couldn't be on vacation and on a strike at the same time." The ALJ found that neither comment evidenced hostility towards the Union. Rather, both were accurate statements of the supervisors' understanding of Stokely's view of vacation time. In his decision issued May 26, 1981, the ALJ concluded that no unfair labor practice had been committed, and recommended that the complaint be dismissed.

The General Counsel filed exceptions to the ALJ's recommendation, and the Board ultimately rejected the ALJ's decision, finding that Stokely had been motivated by antiunion animus, and that the Company's reasons for rescheduling the vacations were therefore pretextual. The Board concluded that the vacation rescheduling constituted "denial of earned vacations and vacation pay" in violation of sections 8(a)(1) and (3), and also amounted to "unilaterally changing the terms and conditions of employment respecting vacation pay and vacations" in violation of 8(a)(5). The Board ordered Stokely to pay to the eighty-two employees whose vacations had been rescheduled the amount of pay they would have received in the absence of rescheduling in addition to whatever paid vacation they had received after August 25th.[7] The Board also ordered Stokely to "cease and desist from . . . unilaterally cancelling scheduled vacations and requiring that all vacations be rescheduled, without notice to or consultation with the Union."

On appeal, Stokely argues that the ALJ was correct in finding that the Company had legitimate business reasons for rescheduling the vacations and that there was no evidence of antiunion animus. Stokely further argues that the Board's remedy is inappropriate even if this court sustains the violations. The back pay order would unjustly penalize the Company, which agreed to reschedule vacations as a condition of ending the strike, and employees who had already taken paid vacations after the strike would be unjustly enriched. The Board frames the issue on appeal as "whether the Company violated sections 8(a)(1), (3) and (5) of the Act by unilaterally withholding accrued vacation pay from striking employees and rescheduling their vacations to retaliate against the Union and discourage employees from engaging in a lawful strike."

### III.

On review of an administrative order, the Board's order must be affirmed if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f). "[T]he meaning of 'on the record as a whole' encompasses not only testimony of witnesses and the Board's findings and order but also the report of the trial examiner." *NLRB v. Wisconsin Aluminum Foundry Co.,* 440 F.2d 393, 398 (7th Cir. 1971). While we may not displace the Board's choice between two fairly conflicting views, neither are we barred from "setting aside a Board decision when [we] cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of the evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Roper Corp. v. NLRB,* 712 F.2d 306, 310 (7th Cir.1983).[8]

---

**7.** Employees who had the good fortune to request a strike period vacation as late as mid-May (when the strike was anticipated) would thus be in a better position than those who had planned to take vacations before June 6th or after August 25th, or had not requested summer vacations far enough in advance. The Board has not suggested that employees who had not requested, or were not entitled to request, vacations until after June 4th should have been able to submit a request after the strike began for a strike period vacation. Under Stokely's policy, all employees were, at least in theory, treated equally, receiving no strike period pay, and full pay for some combi-

nation of work and vacation for the periods before June 6th and after August 25th. The loose ends, of course, are the 19 vacation checks erroneously distributed on June 6th, and the checks distributed May 16, 23 and 30 for vacations extending into the strike period. Neither the Board nor the Company has suggested that employees thus paid for strike period vacations be required to take time off without pay after August 25th.

**8.** We have previously observed that a special problem of administrative review arises when the Board rejects the findings and conclusions of the ALJ. *See NLRB v. Maryland One-Way*

### A. The Section 8(a)(1) and (3) Charges.

Under section 8(a)(1), it is unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in Section 7 of the Act." Section 7 guarantees employees the right to "engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection ...." Under section 8(a)(3), it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any other term or condition of employment to encourage or discourage membership in any labor organization...." The section 8(a)(3) prohibition encompasses discouraging participation in legitimate strikes. *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963).

The principles governing 8(a)(3) cases were summarized by the Supreme Court in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797–98, 18 L.Ed.2d 1027 (1967). Proof of antiunion animus may render unlawful employer conduct which would otherwise be lawful. Some conduct, however, is so "inherently destructive" of employee interests that it may be proscribed without proof of an underlying improper motive. For conduct in this category, the employer bears the burden of explaining his actions as something other than they appear on their face. If the complained of conduct results in "comparatively slight" harm to employees, and the employer has shown a substantial business reason for his actions, his conduct is prima facie lawful, and an affirmative showing of improper motivation is required before an unfair labor practice is established.

In this case, the Board concluded that the two supervisors' remarks about the impossibility of being on strike and on vacation at the same time, remarks that were never adopted by the Company, proved antiunion motivation. The Board therefore concluded that Spurgeon's business justifications for his actions were pretextual, and found it unnecessary to consider whether Stokely's conduct would have violated 8(a)(3) absent proof of antiunion animus.

We accordingly consider first the Board's finding of antiunion animus. We note at the outset that the Board cites, and we find, absolutely no evidence in the record of hostility toward the Union aside from the two supervisors' remarks. At oral argument, counsel for the Board agreed that there was no other evidence. Because it is the employer's speech that is at issue we must decide whether the remarks are protected by the First Amendment, or are impermissibly coercive within the meaning of section 8(c) of the Act which provides that: "The expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefits." 29 U.S.C. § 158(c). This court has held that "the inference of unlawful motive is not to be lightly drawn, and must be based upon substantial evidence in the record and not on conjecture." *G & H Products, Inc. v. NLRB*, 714 F.2d 1397, 1401 (7th Cir.1983) (supervisor's query about employee's intent to join illegal strike held not coercive).

In two recent cases, *Roper Corp. v. NLRB*, 712 F.2d 306 (7th Cir.1983), and *Gossen Company v. NLRB*, 719 F.2d 1354 (7th Cir.1983), this circuit has had occasion to consider the scope of an employer's First Amendment rights. In *Roper*, a supervisor

*Clutch Co., Inc.*, 520 F.2d 856, 865 (7th Cir. 1975). As the Supreme Court concluded in *Universal Camera, supra,* 340 U.S. at 496, 71 S.Ct. at 469, while the "substantial evidence" test is not modified under these circumstances, the evidence supporting the Board's conclusion may be viewed as "less substantial." The ALJ's decision should be given the weight it intrinsically demands, and that will depend in part on the importance of his credibility deter-

minations in a particular case. We are mindful of the distinction recently discussed in *Kopack v. NLRB*, 668 F.2d 946 (7th Cir.1982), between the ALJ's "testimonial inferences" and "derivative inferences." Only the former depend on the ALJ's observations of witness demeanor. In this case the Board explicitly accepted the ALJ's credibility determinations, but rejected his legal conclusions.

explaining why the company could not grant merit pay reviews during negotiations with the new union told employees that they "had a beautiful deal" which they "blew" when they voted for the union. Because the comments came after the union had won the election, and contained no threat of reprisal, or any promise of benefit should the employees repudiate the union, the court refused to find a section 8(a)(1) violation. An employer's statement is "only subject to sanctions when it is demonstrated to be coercive...." 712 F.2d at 311. In *Gossen* the court rejected the Board's conclusion that the employer had violated 8(a)(1) by asking an employee, a declared union supporter, what employees expected to gain from the union. While the supervisor certainly conveyed the "employer's displeasure with union activity," in the absence of any threat, there was nothing objectionable about remarks made in a "free flow" of "casual" conversation between workers and supervisors. 719 F.2d at 1358–1359.

■ The Stokely supervisors' remarks were made in informal conversations after the Union announced the strike, and conveyed neither a threat nor a promise of benefit should the employees return to work. *Compare NLRB v. The Industrial Erectors, Inc.,* 712 F.2d 1131 (7th Cir.1983) (threat to withhold wage increases and benefits should the organizing campaign proceed). As the court succinctly put it in *Roper,* 712 F.2d at 311, "an employer is not required either to say something nice or say nothing at all about a union." An employer need not pretend that he is either pleased by or indifferent to a union's decision to strike. We accordingly find that the Board's finding of antiunion motivation is not supported by substantial evidence.

■ We do not consider it necessary to remand the case to the Board for a determination whether under *Great Dane,* Stokely's conduct was "inherently destructive" of employee rights even in the absence of antiunion animus. In *Great Dane* and *Erie Resistor,* the companies rewarded employees who abandoned the strike and penalized those who continued striking. *See also NLRB v. Westinghouse Elec. Corp.,* 603

F.2d 610 (7th Cir.1979), *enforcing* 237 N.L.R.B. No. 191 (1978) (company rewarded returning strikers with paid vacation time to which they were not entitled under the collective bargaining agreement). There is no such discrimination here. The rescheduling policy was simply announced as fact to employees who asked for their vacation checks. The company offered no inducement for individual workers to break ranks and return to work. Mr. Spurgeon's uncontroverted testimony is that no vacations at all would have been allowed during the strike; all nonstrikers would have been required to work. Neither does Stokely's policy tend to discourage participation in concerted activity in some general way rather than by discrimination against individuals who strike. *See NLRB v. Borden, Inc.,* 600 F.2d 313, 320 (1st Cir.1979) (unequal treatment of different classes of employees not necessary to a finding of an 8(a)(3) violation). Vacation rescheduling was not raised as a threat prior to the strike, although the Union must have assumed that the Company would follow past strike policy. Thus it could have had no effect on the Union's decision to call the strike. The policy may have provided some general incentive to end the strike, but the loss in pay is always a cost that a union must balance against the gain anticipated to result from a strike.

The Board is also simply factually inaccurate in characterizing Stokely's actions as "cancelling" vacations. The vacations were rescheduled, not cancelled. Under the collective bargaining agreement, each employee was entitled to a certain number of weeks off with pay to be taken some time during the year following the anniversary of his date of hire. This is precisely what the employees did receive under the strike settlement, although the vacation time was taken after rather than before August 25, 1980. The only thing "lost" was the opportunity to receive wages for work performed for all weeks after August 25th, which opportunity supposedly would have arisen if vacations had been paid during the strike. Loss of work time and wages is, however, a normal concomitant of a strike. It is also inaccurate to speak of "withholding accrued

vacation pay." The collective bargaining agreement does not provide for vacation pay in lieu of vacations. On an employee's anniversary date, he accrues not a right to a certain sum of money, but a right to submit a request which will be considered in light of seniority and production needs for particular vacation time slots during the succeeding year.

Even if, under *Great Dane,* we agree that there was some "comparatively slight" harm to Union members,[9] we conclude that Stokely has shown substantial business reasons for its decision. The ALJ credited Mr. Spurgeon's testimony, and the Board explicitly adopted this credibility determination, that the Company wanted to maintain production, and that any large or small group of workers who chose not to strike would have been called to work.[10] Mr. Spurgeon also testified that he relied on the contract in concluding that Stokely was entitled to reschedule the vacations. The Board concluded that the contract did not permit mass reschedulings. We think that the Board overstepped its authority in substituting its interpretation of the contract for Stokely's. The Board must determine not whether the Company was correct in its interpretation, but whether it was motivated by its reliance on the contract rather than by antiunion animus. *See Vesuvius Crucible Company v. NLRB,* 668 F.2d 162, 167 (3rd Cir.1981), *denying enforcement to* 252 N.L.R.B. No. 179 (1980); *NLRB v. Borden, Inc.,* 600 F.2d 313, 321 (1st Cir.1979).

We therefore conclude that the Board's finding of a section 8(a)(3) violation is not supported by substantial evidence. In view of this holding, we need not consider whether the remedy would have been appropriate if a violation were sustained.

### B. *The Section 8(a)(5) Charge.*

██ As a preliminary matter we must consider whether the Board properly issued an order under section 8(a)(5) when the matter was not included in the original complaint, the complaint was never amended to reflect this charge, and Stokely was first notified of the charge via the General Counsel's post trial brief filed with the ALJ. In light of our recent holding in *NLRB v. Complas Industries, Inc.,* 714 F.2d 729 (7th Cir.1983) (complaint amended in the midst of the hearing before the ALJ), we would have to conclude that a late amendment in this case would have been proper; the 8(a)(5) charge grew out of the same transaction as the 8(a)(3) charge. However, we conclude that there was a clear violation of Stokely's due process rights. The Company was not informed of the charge in time to prepare a defense for the hearing. Nevertheless, because the General Counsel is apparently satisfied with the evidence as presented, we shall consider whether the Board's finding—based on the evidence adduced and such defense as the Company happened to mount—is supported by substantial evidence.[11] There is no need

**9.** The eighty-two individuals at issue were indeed less well off than they would have been had they received vacation pay during the strike, and wages for full time work for all the weeks after August 25th.

**10.** The Board argues that this testimony is irrelevant because in fact all employees stayed out on strike, and further suggests that the Company should have begun paying strike period vacations once it became apparent that no workers were crossing the picket lines. The relevant point, however, is not what Union members did after Stokely's June 4th decision, but what motivated the Company's decision. Besides, we have no way of knowing how many employees would have chosen to work in the absence of the union violence.

**11.** Counsel for the General Counsel argued in the post trial brief filed with the ALJ that the

8(a)(5) charge could properly be considered because it was fully litigated. However, the only transcript pages cited in support of this assertion merely show that the Company did not notify the Union of its vacation rescheduling decision—a matter never in dispute. At the hearing before the ALJ, Stokely did attempt to introduce evidence that during the 1980 strike settlement negotiations, the Union sought to have vacations made irrevocable within 60 days of the scheduled starting date, but was unsuccessful. Based on the General Counsel's argument that this evidence was irrelevant to a hearing on 8(a)(1) and (3) violations, this evidence was not admitted. In retrospect, this evidence became quite relevant to the 8(a)(5) charge, and the ALJ properly allowed Stokely to amend the record to reflect this evidence.

for a remand to enable the Company to marshall its defense unless the Board's finding would stand on the record before us now.

Under section 8(a)(5) it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." This section has been interpreted to require bargaining over a change in working conditions, and notice adequate to permit effective bargaining. The Board found that by rescheduling vacations for an entire group of workers without giving the Union notice and an opportunity to bargain over this purported change in working conditions, Stokely violated section 8(a)(5). Quite aside from the impracticality of expecting bargaining over Stokely's necessarily quick response to the imminent strike, which was itself the result of a bargaining impasse, we see no evidence, substantial or otherwise, to support this charge. The Board's holding ignores both the management rights and vacation clauses of the contract and evidence of past practice during strikes, which itself would suggest that there has been no change in working conditions. The holding seems to be predicated entirely on a wholesale-retail distinction whereby the Company may reschedule individual workers but not groups. There is no support for this distinction in the collective bargaining agreement. Further, the Union's attempt during the 1980 bargaining to gain some control over vacation rescheduling (*see* n. 11 *supra*) indicates that the Union interpreted the old contract as leaving vacation scheduling largely to the discretion of management. In the absence of a change in working conditions, the Company is under no obligation to bargain pursuant to 8(a)(5). Further, the Board's "cease and desist" order would only give the Union, through an unfair labor practice proceeding, that which it did not succeed in obtaining at the negotiating table. That is impermissible. *Ace Beverage Co.,* 253 N.L.R.B. No. 124 (1980).

### IV.

Finally, we cannot help but observe that Mr. Martin has long since left Stokely's employ, and that the Union and Stokely amicably settled their differences in August of 1980. This case has taken the complaint of one disgruntled (ex)employee, and has prolonged a dispute that could have been laid to rest many months ago.

For all the foregoing reasons, the petition for review is GRANTED and the application for enforcement is DENIED.