**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STOR–RITE METAL PRODUCTS, INC., Respondent.**

**No. 87–2161.**

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1988.

Decided Sept. 12, 1988.

Judith Dowd, Collis Suzanne Stocking, N.L.R.B., Washington, D.C., for petitioner.

J. Charles Sheerin, Michigan City, Ind., for respondent.

Before BAUER, Chief Judge, and COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

The National Labor Relations Board (the "NLRB" or "Board") seeks enforcement of its order directing Stor–Rite Metal Products, Inc. ("Stor–Rite") to cease and desist from an alleged unfair labor practice and to make its employees whole for resulting lost earnings. The NLRB found that Stor–Rite impermissibly reduced the hours of its part time painting department, or "powder line" employees in retaliation for the activities of one powder line employee, Paul Martin, when Martin attempted to convince Stor–Rite's management that he either was or should have been covered by the collective bargaining agreement between Stor–Rite and its unionized, full time production workers. The NLRB ruled that Martin's conduct constituted protected "concerted activit[y]," *see* 29 U.S.C. § 157 (1982), and that Stor–Rite reduced the hours worked by the powder line employees to retaliate against Martin. The Board concluded that Stor–Rite had committed an unfair labor practice by interfering with the rights of its workers to engage in concerted activities, *id.* at § 158(a)(1), and furthermore committed acts to discourage union membership through discrimination in the terms and conditions of employment. *Id.* at § 158(a)(3).[1] We review the Board's deter-

---

**1.** The Board also found that Martin was not, in fact, within the coverage of the agreement, thus

Stor–Rite did not commit an unfair labor practice by denying Martin union benefits. Martin

mination pursuant to section 160(e) of the National Labor Relations Act ("the Act"). *Id.* at § 160(e). Because we hold that Stor–Rite did not act with a retaliatory motive in response to Martin's alleged concerted activity, we deny enforcement.

### FACTS

Stor–Rite manufactures metal display shelving and related products. Prior to 1982, Stor–Rite had its painting, or "powder coating" done by other firms. In 1982, Stor–Rite moved to its current plant in Michigan City, Indiana and established its own painting facility or "powder line." Since then, Stor–Rite has powder coated its own products and also has contracted to do powder coating for other companies' products. However, Stor–Rite's powder coating process is much faster than its manufacturing process and the capacity of Stor–Rite's powder line is also greater than the combined total of Stor–Rite's production and outside contract work. Thus, Store–Rite has never been required to run its powder line full time.

At all times relevant to the dispute at hand, Stor–Rite's full time production and maintenance workers have been unionized and have been covered by a collective bargaining agreement ("the agreement") as contrasted with the *powder line* employees who have always been considered part time workers and thus are not covered by the labor agreement. Consequently, these full time production (Stor–Rite) employees receive higher pay than do the powder line employees, including the receipt of holiday pay, insurance, pensions and other benefits not available to powder line employees. Powder line employees are allowed to "bid" on any available full time positions in Stor–Rite's plant and frequently are given preference in hiring decisions.

On July 9, 1983, Stor–Rite entered into a collective bargaining agreement with the General Service Employees Union, Local No. 73 ("the union"). The agreement remained in effect through November 8, 1985, and applied to "all full time production and maintenance employees and plant

clerical employees." The agreement did not contain a definition of "full time," but according to the record, the parties to the agreement, both Stor–Rite and the union, understood full time workers to be those who had completed a contractually-required probationary period. The agreement provided that, "The probationary period for a new employee ... shall be forty-five (45) calendar days from the date of hire." The parties agree that an employee cannot fulfill this requirement until that employee has worked at least forty hours per week during the probationary period. According to the record, Stor–Rite and the union have always understood the agreement to exclude all part time employees.

Stor–Rite's powder coating department work schedule depends on the volume of its own production and outside contract work, each of which is subject to change as demand changes. Therefore, the number of powder line employees and their hours also vary to accommodate the changing work load. In mid–1984, Dwayne Norman, chief steward for the union, learned that some powder line employees often worked forty or more hours per week during busy periods. Norman approached Stor–Rite's management and asked whether those employees might be brought within the bargaining unit and included in the agreement. Stor–Rite replied that it could do all necessary powder coating in two or three days per week, and thus there was not enough powder coating work to justify running the powder line full time. Norman also discussed the matter with the union's business manager, who told Norman that the union had proposed including powder line employees in the agreement during negotiations on the current contract, but that the union had dropped that proposal when Store–Rite's management contended that full time operation of the powder line was not financially feasible. Thus, according to Norman, both the union and Stor–Rite understood the agreement to exclude powder line employees because they were part time only. The very terms of the labor agreement reinforce this point by omitting the

does not challenge this determination, so we will not discuss it on review.

powder coating department in its listing of the departments included within the labor contract. As a result of this information, after Norman's mid–1984 discovery that powder line workers sometimes worked forty-hour weeks, the union did not pursue the inclusion of the powder line workers in the agreement through the contractual grievance procedure.

Stor–Rite hired Paul Martin, the charging party in this case, on September 25, 1984. When Stor–Rite hired Martin, Stor–Rite's powder coating department supervisor, Gregory Jaques, advised Martin that he was being hired as a part time worker. Jaques informed Martin he would not always work forty hours per week, nor would he receive those benefits available to those workers classified as full time employees. It is interesting to note that between September 1984 and February 1985, Jaques sometimes provided powder line employees with extra work (make-work projects), including maintenance tasks and production work in other departments. Moreover, although Stor–Rite's management intended that the powder coating work should be shared by six to eight regular part time employees, Jaques limited his hiring selections to three or four. Jaques assigned the extra work and minimized hiring as a favor to the part time workers, to give them an opportunity to make more money than they would if the department were operated according to company policy. As a result, the three or four powder line employees often worked forty or more hours per week between September 1984 and February 1985. For example, a synopsis of Stor–Rite's employment records reflects that during September, October and November 1984, Martin and another powder line employee, Rick East, worked seven consecutive weeks of forty or more hours (thus technically satisfying the minimum-hours requirement of the contractual probationary period) and a third powder line employee, Tim Slayden, worked six consecutive weeks of forty or more hours (thus conceivably satisfying the minimum-hours

requirement).[2] Jaques allowed the extra work despite Stor–Rite's management's directive that powder line workers retain their status as part time employees only.

Soon after Martin started work, he began to complain to union steward Norman that he should be considered as a full time employee and should receive the full panoply of union benefits under the agreement. After relaying Martin's concerns to Stor–Rite's controller and treasurer, Frank O'Brien, Norman told Martin that powder line employees were specifically excluded from the labor agreement because of the inherently sporadic, part time nature of that department's work. Despite Norman's explanation, Martin continued to complain and, in late October 1984, Martin approached fellow powder line workers East and Slayden and discussed the problem with them. Martin suggested that he, East and Slayden approach Norman to ask about being included in the present labor agreement. However, neither East nor Slayden agreed to join Martin, nor did they suggest that he approach Norman on their behalf. East declined because he intended to apply for a full time position. Slayden told Martin that he currently was working forty to forty-five hours per week and was satisfied. Martin on his own once again complained to Norman in November 1984, but was told that the status of powder line workers was settled under the current agreement and that the matter would have to wait until a new agreement was negotiated.

In January 1985, two months later, Martin once more approached Norman, complaining that the union was discriminating against the powder line workers by failing to press for their inclusion in the agreement. Norman reiterated his position that both the union and Stor–Rite management had always considered the powder line employees as part time only and he suggested to Martin that he take his complaint to the Indiana Department of Human Rights. Martin followed Norman's suggestion, but

---

**2.** The findings of the ALJ and the Board to the contrary are not supported by substantial evidence.

before going to the Department of Human Rights he again approached East and Slayden to enlist them to join in his complaint. East and Slayden remained uninterested and refused to join in the filing of the complaint. Martin also advised supervisor Jaques that he was filing a complaint against Stor–Rite and the union. Jaques replied that he wished the powder line were unionized, if only to end further bickering, but that the department's sporadic work schedule made full time status impractical. He then told Martin to "do what you have to do." After Jaques spoke to Martin, he discussed Martin's possible filing of the complaint with East and Slayden. Jaques told Slayden that he (Jaques) had been doing powder line employees a favor by allowing the extra hours and that he would have to reduce their hours if Martin filed the complaint.

On February 26, 1985, Martin went to the Indiana Department of Human Rights to file his complaint. A worker there told Martin that his problem fell outside the authority of that department, but she offered him help in filling out an NLRB complaint and made an appointment with Martin for that purpose. The next morning, Jaques met Martin, East and Slayden when they reported for work. Jaques told Martin, "You fucked up by going to Human Rights," and told all three that he had gotten a call (apparently from O'Brien) and now would have to reduce the hours of the powder line employees. On March 7, 1985, Martin returned to the Indiana Department of Human Rights and filed and signed the complaint alleging a violation of certain NLRB regulations and rules against the union and Stor–Rite.[3]

When O'Brien received a copy of Martin's complaint, he called supervisor Jaques into his office and told Jaques to hire more workers for the powder line and to reduce assignments of unnecessary make-work maintenance projects to powder line employees. O'Brien reminded Jaques that powder line workers were meant to remain part time and instructed Jaques, "Let's try to keep it that way." Jaques complied.

By reducing the assignment of maintenance work and hiring more workers, he reduced powder line employees' hours to an average of approximately thirty hours per week by March 1985. Improvements in the efficiency of the powder line also contributed to the reduction in powder line labor throughout the early months of 1985. In April 1985, Martin complained about the reduced hours. Jaques, in reply, suggested that the reduction in work would not have been necessary had Martin not brought the matter to the attention of Stor–Rite's management. Jaques told Martin, "[Y]ou made your bed, you're going to have to lie in it." During the summer of 1985, Stor–Rite's powder coating work demands fell off and the workers' hours declined still further, to approximately twenty hours per week.

## DECISIONS OF THE ALJ AND THE NLRB

An Administrative Law Judge (the "ALJ") conducted a three-day hearing and found that Stor–Rite had not committed any unfair labor practices when it reduced the hours of the powder line employees. The ALJ also found that Martin had not engaged in concerted activity when he asserted that he was or should have been covered by the agreement. When the ALJ found that Martin's activities were not concerted, he relied on the *Meyers Industries* definition of concerted activity. *See Meyers Industries, Inc.*, 268 N.L.R.B. 493 (1984), *rev'd sub nom.*, *Prill v. N.L.R.B.*, 755 F.2d 941 (D.C.Cir.1985) (remanding for reconsideration in light of *N.L.R.B. v. City Disposal Systems, Inc.*, 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984)). In *Meyers Industries*, the NLRB adopted an "objective" standard of concerted activity. *Id.* at 496. The objective standard encompasses activities which are "actually concerted," those in which two or more employees act together to achieve common goals. *Prill*, 755 F.2d at 950. *Meyers Industries* -type concerted activity also may be found where a single employee's acts are closely related to group activity. Thus, federal

3. The NLRB Regional Director subsequently dismissed the charge against the union.

courts have taken a slightly broader view of "objective" or "actual" concerted action than the standard suggests on its face, holding that objective or actual concerted activity also may be found where a single employee either acts with the express or implied authority to represent others, or acts with the intent to induce group activity. *City Disposal Systems*, 465 U.S. at 831, 104 S.Ct. at 1511 (citing *ARO, Inc. v. N.L.R.B.*, 596 F.2d 713, 717 (6th Cir.1979); *N.L.R.B. v. Northern Metal Co.*, 440 F.2d 881, 884 (3d Cir.1971)).[4] In those situations, a concert of activity may be found in the relationship between the single actor and the group the actor represents or the group from whom the actor seeks to induce concerted activity. *Id.* In the case before us, the ALJ found that East and Slayden had expressly rejected Martin's efforts to convince them to join him in seeking inclusion in the agreement—and Martin did not allege that Stor–Rite retaliated against him merely for speaking with them—so Martin's activity was not concerted within the *Meyers Industries* standard.

■ As an alternative basis for the ruling, the ALJ found that Stor–Rite's reduction of the hours of powder line employees was not retaliatory. Assuming that an employee has engaged in concerted activity, an employer's actions toward that employee are not retaliatory if the employer demonstrates that it would have taken the same action "regardless of [its] forbidden motivation." *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983). During the ALJ's hearing into this matter, Stor–Rite's Controller and Treasurer, O'Brien, testified that he would have directed additional hiring and a reduction of maintenance work in the powder coating department immediately upon hearing that powder line employees were frequently violating company policy and working forty hours or more per week. O'Brien contended that Stor–Rite would have taken this action without regard to Martin's attempts to secure the benefits of the agreement for those workers. According to O'Brien, Stor–Rite has always intended that the powder coating department operate part time only, and Jaques acted directly in contravention to established company policy when he allowed power line workers to work forty or more hours per week. Thus, the reduction of powder line workers' hours was intended merely to carry out established company policy and to ensure that those workers remained part time, not to punish them for Martin's activities. The ALJ accepted O'Brien's testimony as reliable and truthful and found that the reduction in hours was not retaliatory, but was "economically motivated."

■ A three-member panel of the NLRB reviewed the ALJ's decision and reversed the ALJ in two important respects. Initially, although the panel did not disagree with the ALJ's conclusion under the *Meyers Industries* standard, the panel found that Martin had engaged in concerted activity as defined by another rule, the so-called *Interboro* doctrine. *See Interboro Contractors, Inc.*, 157 N.L.R.B. 1295 (1966), *enf'd*, 388 F.2d 495 (2d Cir.1967). According to the *Interboro* doctrine, a single worker's good faith assertion of rights found in a collective bargaining agreement may constitute concerted activity. The N.L.R.B. has justified the *Interboro* doctrine on two bases. "First, the assertion of a right contained in a collective-bargaining agreement is an extension of the concerted action that produced the agreement ... and second, the assertion of such a right affects the rights of all employees covered by the collective-bargaining agreement." *City Disposal Systems*, 465 U.S. at 829, 104 S.Ct. at 1510 (citations omitted). The employee need not explicitly cite the contractual provision relied upon, so long as the "employee's statement or action is based on a reasonable and honest belief"

---

4. These decisions also may be read as recognizing forms of *"per se"* or "constructive" concerted activity. *See City Disposal Systems*, 465 U.S. at 831, 104 S.Ct. at 1511. We do not consider the labels particularly important here, however, and classify these forms of concerted action under the "objective" heading only because the ALJ explicitly relied on the *Meyers Industries* approach when he analyzed Martin's conduct.

that the right asserted may be found in the contract. *Id.* at 837, 104 S.Ct. at 1514. Because the agreement in this case applied to "all full time" production workers and Martin's weekly hours frequently appeared to be in the full time range prior to their reduction, the NLRB concluded that Martin's assertion that he was a full time employee within the meaning of the agreement constituted a reasonable and honest assertion of contractual rights and, therefore, was presumptively protected.[5]

The Board then found that Stor–Rite committed an unfair labor practice by acting with a retaliatory motive when it reduced the powder line workers' hours. In reaching its decision, the Board expressly affirmed the finding of the ALJ that Stor–Rite Treasurer and Controller O'Brien acted properly without an impermissible motive when he directed supervisor Jaques to reduce powder line workers' hours. The Board also agreed with the ALJ that Stor–Rite had every right under the agreement and the National Labor Relations Act ("the Act") to maintain the hours of powder line employees at a part time level. However, the Board believed that supervisor Jaques exhibited a retaliatory motive (a motive that could be imputed to Stor–Rite) because Jaques carried out O'Brien's directive too zealously. According to the Board,

> "Jaques, however, did not simply reduce the employees' hours to just below 40 to make it clear they were not full-time employees. By July he had instead reduced their weekly hours to below 20. In light of Jaques' [sic] statements to Martin that he had 'fucked up by going to Human Rights' and that he had 'made [his] bed' and was 'going to have to lie in it,' we find that Jaques reduced the powder-line employees' hours so drastically in retaliation for Martin's protected claim."

*Stor–Rite Metal Products, Inc.,* 283 N.L.R.B. No. 123, at 7 (April 30, 1987) (footnote omitted); *see also Graves Trucking, Inc. v. N.L.R.B.,* 692 F.2d 470, 472–74 (7th Cir.

1982) (conduct and statements of supervisor may be attributed to employer); *N.L.R.B. v. Berger Transfer & Storage Co.,* 678 F.2d 679, 688–89 (7th Cir.1982) (same). Thus, the N.L.R.B. concluded that Stor–Rite had committed an unfair labor practice, in violation of sections 158(a)(1) and (3) of the Act. 29 U.S.C. §§ 158(a)(1), (3). The Board then ordered Stor–Rite to "[c]ease and desist from ... [r]educing its employees' work hours because an employee honestly and reasonably asserted a right grounded in the Union's collective-bargaining agreement with [Stor–Rite]" and to make the powder line workers whole with back pay for any unnecessary reduction in their hours. *Stor–Rite Metal Products, Inc.,* 283 N.L.R.B. No. 123, at 10–11.

One of the three-member panel dissented. In the dissenter's view, the ALJ properly found that Stor–Rite had borne its burden "of showing that it would have taken the action in question even in the absence of the protected concerted conduct." *Id.* at 13 (dissenting opinion). The dissenting member disagreed with the majority's contention that a retaliatory motive could be inferred from Jaques's implementation of a system which resulted in greater cuts in its employees' hours than were absolutely necessary. In the dissenter's view:

> "The fact that the Respondent eventually reduced the powder-line employees' weekly hours to a greater extent than was strictly necessary to reduce them below the 40–hour average similarly does not persuade me to join my colleagues in the majority. The record shows that the Respondent put in place a procedure designed to ensure that it would not thenceforth ever find itself in a position of needing to ask powder-line employees to work 40 hours a week or more. This procedure resulted in much less work for powder-line employees in July but in earlier months it simply fulfilled the goal of keeping the employees' weekly hours be-

---

**5.** An employee's concerted activity may lose its protected status if the employee engages in the activity in a sufficiently "abusive manner." *City Disposal Systems,* 465 U.S. at 837, 104 S.Ct. at

1514. Stor–Rite has advanced no such argument, however, nor do we see any indication that Martin's conduct was abusive of Stor–Rite's rights as an employer.

low 40. The institution of such a procedure is not inconsistent with an aim of simply assuring that the powder-line employees would not appear to be full-time employees, arguably subject to the collective-bargaining agreement."

*Id.* at 14–15.

## DISCUSSION

### A. The Standard of Review

■ "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). The substantial evidence standard does not allow the reviewing court to reject the NLRB's "choice between two fairly conflicting views," but we may set aside the Board's decision " 'when [we] cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in entirety furnishes, including the body of the evidence opposed to the Board's view.' " *Stokely–Van Camp, Inc. v. N.L.R.B.*, 722 F.2d 1324, 1328 (7th Cir. 1983) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)); *Roper Corp. v. N.L.R.B.*, 712 F.2d 306, 310 (7th Cir.1983) (also quoting *Universal Camera*). For purposes of our review, the record as a whole includes not only the documentary and testimonial evidence presented in the case, but also the report of the ALJ, whose findings must be accorded "the relevance they reasonably command." *Universal Camera Corp.*, 340 U.S. at 497, 71 S.Ct. at 469. When, as in the case before us, the Board rejects the factual findings of the ALJ, "a special problem of administrative review arises." *Stokley–Van Camp, Inc.*, 722 F.2d at 1328 n. 8. We do not abandon the "substantial evidence" standard of review in such a case, but "the evidence supporting the Board's conclusion may be viewed as 'less substantial' " than it would be if the Board and the ALJ had reached the same conclusion. *Id.* The significance of the findings of the ALJ depends largely on the importance of credibility determinations to the outcome of the case at issue. *Universal Camera*, 340 U.S. at 496, 71

S.Ct. at 468–69; *Stokely–Van Camp*, 722 F.2d at 1329; *Kopack v. N.L.R.B.*, 668 F.2d 946, 950–54 (7th Cir.1982). "Credibility," in this context refers primarily to "testimonial inferences"—those that rest on direct observations of the demeanor of witnesses—rather than "derivative inferences"—those that are drawn from the substance of the evidence. *Kopack*, 668 F.2d at 953–54 (discussing the analysis of *N.L.R.B. v. Gold Standard Enterprises, Inc.*, 607 F.2d 1208, 1210–12 (7th Cir.1979)). We have cautioned that the distinction between testimonial and derivative inferences will not always be clear; however, the distinction provides a useful analytical tool in applying the *Universal Camera* standard, a standard which by its very nature is quite imprecise. *Id.* at 950, 954. Thus, our application of *Universal Camera* cannot be reduced to a simple, bright-line rule. However, we express our observations in *Kopack* as a brief set of general propositions to guide our review.

1. In all cases, the standard of review is the "substantial evidence" standard.

2. Because the ALJ's report is a part of the record with independent significance, a factual determination of the Board that departs from the findings of the ALJ stands on weaker ground than one that does not.

3. Because only the ALJ can view the demeanor of the witnesses, any of the ALJ's findings that turn on express or implied credibility determinations take on particular significance on review.

*See generally Universal Camera*, 340 U.S. at 492–97, 71 S.Ct. at 466–69; *Kopack*, 668 F.2d at 951–56. In sum, when we review the Board's factual findings, we analyze them to ascertain whether they are supported by substantial evidence on the record as a whole, taking into account the contrary findings of the ALJ and particularly those findings that turn on the ALJ's first-hand observation of the witnesses.

### B. Were Stor–Rite's Actions Retaliatory?

The question of whether Martin's actions constituted protected, concerted activity need not be decided, because we conclude

that Stor–Rite did not act with the motive of retaliating against any concerted activity in which Martin might have engaged.

◼ The NLRB panel grounded its finding of a retaliatory motive on three factors: (1) supervisor Jaques's implementation of the plan by reducing powder line employees' hours by more than was strictly necessary, (2) Jaques's comment to Martin that he "fucked up by going to Human Rights," and (3) Jaques's later comment to Martin that he had "made his bed" and was "going to have to lie in it." Stor–Rite contends that the Board erroneously isolated Jaques's acts and statements from their proper context. Stor–Rite argues that the Board therefore found a retaliatory motive when, in fact, the record clearly demonstrates that Jaques merely acted to implement O'Brien's directive and that Jaques's comments simply point out that the ultimate result of Martin's efforts was a loss of work for everyone in his department. After reviewing the entire record, we conclude that Stor–Rite is correct when it argues that the Board's finding of a retaliatory motive was clearly erroneous. We hold that the NLRB's finding that Jaques acted in response to a retaliatory motive toward Martin overturning the ALJ's finding is not supported by substantial evidence.

"This court has firmly held that the inference of unlawful motive is not to be lightly drawn, and must be based upon substantial evidence in the record and not on conjecture." *G & H Products, Inc. v. N.L.R.B.*, 714 F.2d 1397, 1401 (7th Cir. 1983). Moreover, "[t]he expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefits." 29 U.S.C. § 158(c). As a result, we have reversed findings of anti-union motivation based on isolated comments by a single supervisory employee, when little other evidence of improper motivation was found. *See, e.g., Stokely–Van Camp*, 722 F.2d at 1329–31; *Roper Corp. v. N.L.R.B.*, 712 F.2d 306, 311 (7th Cir.1983). We must

therefore examine the evidence in its appropriate context and not in isolation.

Initially, the Board, in finding a retaliatory motive, relied heavily on Stor–Rite's reduction of powder line workers' hours to less than twenty hours per week, rather than just under forty hours per week. We hold that the NLRB reached its conclusion by erroneously and selectively restricting its analysis to employment figures for a single month, rather than viewing the evidence regarding the respective time period in question. By focusing exclusively on the month of July (the month in which powder line workers' hours reached their lowest level during the entire period at issue), the Board exacerbated and exaggerated the severity of the reduction in hours. Stor–Rite offered uncontested evidence that the low July totals were caused substantially by a reduction in its powder coating work demands from other firms. In fact, the powder line was closed entirely for one week during July. Moreover, the Board's opinion for some unknown reason disregards Stor–Rite employment records that show that powder line workers averaged over thirty hours per week in March 1985, the month immediately following Martin's filing of his complaint. If Stor–Rite acted with retaliatory intent, then why did it delay the full impact of its retaliation until months later? The Board's decision is silent on this matter and offers no explanation. Moreover, powder line workers' hours rebounded after July and returned to the twenty-five to thirty hours per week range. On review of the record as a whole, it is difficult to escape the well reasoned and fully documented conclusion of the ALJ who had the opportunity to view and weigh the testimony of the respective witnesses, as well as of the dissenting Board panelist. In his opinion, Stor–Rite merely "put in place a procedure designed to ensure that it would not thenceforth ever find itself in a position of needing to ask powder line employees to work 40 hours a week or more. This procedure resulted in much less work for powder line employees in July, but in earlier months it simply fulfilled the goal of keeping the employees' weekly hours below 40." Based on our

review of the record, we find this view most compelling and hold that the Board's opinion exaggerates the degree and reason to which Stor–Rite reduced the hours of powder line employees.

The Board's finding that Jaques (and therefore Stor–Rite) bore a retaliatory motive was further based on the isolated statements of one supervisory employee. As we have emphasized in the past, however, the Act was not intended to stifle an employer's right to communicate its opinion in a noncoercive manner to its employees. 29 U.S.C. § 158(c); *Stokely–Van Camp*, 722 F.2d at 1329–31; *G & H Products*, 714 F.2d at 1400–01; *Roper*, 712 F.2d at 311; *N.L.R.B. v. Cutting, Inc.*, 701 F.2d 659, 665–66 (7th Cir.1983). It is therefore crucial that an employer's statements be examined in their proper context. *G & H Products*, 714 F.2d at 1401; *Cutting*, 701 F.2d at 665. Moreover, isolated and ambiguous statements by a single supervisory employee do not rise to the level of substantial evidence of improper motive in the absence of other evidence of anti-union animus. *Stokely–Van Camp*, 722 F.2d at 1329–30; *Roper*, 712 F.2d at 311. We must therefore examine Jaques's statements to Martin in the context in which they were made.

Initially, on the morning after Martin had gone to the Department of Human Rights, Jaques told Martin that he had "fucked up" by doing so. However, Jaques made the statement after Martin's complaint had brought Jaques's practice of assigning extra work to the attention of Stor–Rite's management, who then directed Jaques to end the practice. Jaques, of course, had been assigning the extra work only as a personal favor to the workers and realized that the practice would be discontinued if management discovered it. Jaques's comment thus referred to the obvious result of Martin's complaint (the end of the extra work assignments for all employees), and did not communicate any sort of threat. Without doubt, an employer may honestly comment on the effects of an employee's concerted activity. *Roper*, 712 F.2d at 311. In context, Jaques's comment meant only that Martin's complaint

brought an end to the extra work. In addition, we find it significant that Jaques did nothing to try to prevent Martin from filing his complaint; in fact, Jaques explicitly encouraged Martin to "do what you have to do." Comments made after concerted activity has taken place are inherently less coercive than those which precede concerted activity. Furthermore, Jaques's clearly noncoercive attitude prior to Martin's action strips the subsequent statement of any latent coercive effect. *See Stokely–Van Camp*, 722 F.2d at 1330; *Roper*, 712 F.2d at 311. Our review of the record convinces us that Jaques's first comment to Martin was nothing more than an after-the-fact comment on the result of Martin's complaint. The statement was devoid of coercive impact.

We view Jaques's second comment similarly. In April 1985, after Stor–Rite management had ordered the reduction in powder line workers' hours, Martin approached Jaques to ask whether he could work more hours. Referring to the impact of Martin's complaint, Jaques replied, "[Y]ou made your bed, you're going to have to lie in it." Like Jaques's first comment, this statement was made after Martin's concerted activity took place and referred honestly to the ultimate result of Martin's complaint—the directive that Jaques conform his work assignments to company policy. Once again, the setting in which the comment was made indicates no coercive intent or effect. *Stokely–Van Camp*, 722 F.2d at 1329–31; *Roper*, 712 F.2d at 311.

The Board's findings of retaliatory intent on the part of supervisor Jaques also conflict with an implied credibility finding by the ALJ. The ALJ, however, did not comment explicitly on Jaques's credibility or his motive in enacting O'Brien's directive. However, Jaques testified extensively regarding how and why he reduced the hours of the powder line workers. According to Jaques, the total reduction in powder line employees' hours was the result of three changes that occurred from early 1985 onward: (1) additional hiring and reduction in maintenance assignments as necessary to

comply with company policy, (2) improved efficiency of the powder line, and (3) a loss of powder coating contract business in July 1985. Of course, when the ALJ heard Jaques's testimony, the ALJ was well aware that any impermissible motive of Jaques could be attributed to Stor–Rite; the law is quite clear on that point. *See, e.g., Graves Trucking, Inc. v. N.L.R.B.,* 692 F.2d 470, 472–74 (7th Cir.1982); *N.L.R.B. v. Berger Transfer & Storage Co.,* 678 F.2d 679, 688–89 (7th Cir.1982). Therefore, when the ALJ found that Stor–Rite lacked any impermissible, retaliatory motive, he found that Jaques also lacked any such motive, *a fortiori.* To reach this conclusion, the ALJ obviously had to rely on Jaques's testimony regarding the reasons for the reduction in the workers' hours. And, in reversing the ALJ, the Board rejected the ALJ's implied credibility determination without justification or explanation. *Universal Camera* requires that the ALJ's opportunity to view and weigh the witnesses' testimony first-hand must be accorded appropriate respect. *Universal Camera,* 340 U.S. at 496–97, 71 S.Ct. at 468–69; *Stokely–Van Camp,* 722 F.2d at 1328–29; *Kopack,* 668 F.2d 950–54. We decline to allow the Board to escape the impact of *Universal Camera* merely because the ALJ made the credibility determination at issue *sub silentio.*

In summary, the Board conceded that Stor–Rite acted within its rights when it reduced its powder line workers' hours to ensure that they would not be considered "full time production and maintenance employees" under the agreement between Stor–Rite and the union. Then, by isolating two comments by supervisor Jaques and focusing on Stor–Rite's labor figures for a single month, the Board found an unfair labor practice in the *manner* in which Stor–Rite accomplished its concededly permissible policy. To do so, the NLRB ignored important evidence regarding the context of Stor–Rite's words and deeds and also overturned the ALJ's implicit credibility determination concerning a pivotal witness, Jaques. Under these circumstances, viewing the record as a whole including the evidence opposing the Board's decision, the evidence supporting the Board's findings cannot be deemed substantial. We hold that the evidence in the record is insufficient to support the Board's finding that Stor–Rite acted with a retaliatory motive.

ENFORCEMENT DENIED.