890 F.2d 52
 132 L.R.R.M. (BNA) 3063, 58 USLW 2391,
113 Lab.Cas. P 11,682
 WEATHER SHIELD MFG., INC., MILLWORK DIVISION,
Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
and
Midwestern Industrial Council, Local 1035, United
Brotherhood of Carpenters and Joiners of America,
Intervenor.
 Nos. 89-1068 & 89-1270.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 15, 1989.
Decided Nov. 29, 1989.
As Amended Dec. 5 and Dec. 7, 1989.
 
 Robert C. Stone, Marshall W. Grate, Clary, Nantz, Wood, Hoffius, Rankin & Cooper, Grand Rapids, Mich., for petitioner/cross-respondent.
 Aileen A. Armstrong, Peter D. Winkler, N.L.R.B. Appellate Court, Enforcement Litigation, Washington, D.C., Barbara S. Isaacman, Ronald M. Sharp, Herbert S. Dawidoff, Minneapolis, Minn., Kathy L. Krieger, Washington, D.C., Michael J. Westcott, Milwaukee, Wis., for N.L.R.B. in Case No. 89-1270.
 Timothy Sears, Washington, D.C., for intervenor.
 Aileen A. Armstrong, N.L.R.B., Appellate Court--Enforcement Litigation, Washington, D.C., for N.L.R.B. in Case No. 89-1068.
 Before CUDAHY, and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 This case involves petitioner Weather Shield Manufacturing's ("Weather Shield") request for review and the General Counsel's request for enforcement of the National Labor Relations Board's (the "Board") finding of unfair labor practices. The Board found that two of Weather Shield's supervisors made promises of better wages and benefits in return for decertification of the Union. The Board therefore found Weather Shield guilty of engaging in unfair labor practices, invalidated the results of the decertification election which the Union lost, and ordered a new election. In doing so, the Board reversed the decision of the Administrative Law Judge ("ALJ") who, in dismissing the Union's objections to the decertification election, concluded in his written opinion that: "It would be difficult in a real-life work place, to imagine an election freer of employer influence than the July 15th election conducted at this plant." 292 N.L.R.B. No. 1 (1988).[1] Because the Board's findings are not supported by substantial evidence on the record, we reverse.
 
 BACKGROUND
 
 2
 In 1982, Weather Shield filed a decertification petition seeking a Board-conducted election at Weather Shield's Millwork Division on the question of whether production and maintenance employees wanted to retain the United Brotherhood of Carpenters and Joiners of America, Local 1035 ("the Union") as their collective bargaining representative. Agreeing that a question of representation existed, the Union entered into a Stipulation for Certification Upon Consent Election, to be conducted by the Board on July 15, 1982.
 
 
 3
 During the two months prior to the election, Weather Shield attempted to make the vote as free from employer influence as possible. To that end, Weather Shield discussed the decertification petition and the election process with its supervisors in early June of 1982. Weather Shield instructed its supervisors not to promise anything, not to threaten anybody, and not to interrogate employees. Weather Shield directed its supervisors to say as little as possible about the union issue, in essence, conducting a "no campaign campaign." ALJ at 8.
 
 
 4
 Two weeks before the election, apparently responding to a Union campaign, Weather Shield changed its strategy, and decided to conduct three meetings with small groups of employees. During these meetings, the employees were told that they would not lose wages or benefits if the Union were decertified. In addition, Weather Shield emphasized that it could not and would not make any promises as to future wages. On the day before the election, Weather Shield distributed a written, "no-cut" guarantee to bargaining unit employees promising to maintain the status quo if the Union were decertified.
 
 
 5
 The Union lost the subsequent election, with 123 employees voting to decertify the Union and 110 voting to retain the Union. Weather Shield subsequently ceased recognizing the Union as a collective bargaining representative. The Union filed timely objections to the election proceeding, accusing Weather Shield of engaging in pre-election misconduct which interfered with the employees' freedom of choice. Subsequently, the Union filed unfair labor practice charges which incorporated the same accusations as contained in its objections and which further accused Weather Shield of refusing to bargain with the Union. The Regional Director eventually issued two unfair labor practice complaints and consolidated them with the Union's objections for hearing.
 
 
 6
 At the hearing, the General Counsel and the Union attacked the decertification results on two grounds. First, they contended that Weather Shield's no-cut guarantee illegally interfered with the employees' freedom of choice. The Board, subsequent to the decision by the ALJ, found that this constituted permissible conduct. Consequently, this issue is not before us. Secondly, they contended that two of Weather Shield's supervisors promised better wages and benefits if the Union lost the election.
 
 
 7
 The nature of these statements and their importance, as well as the differing interpretations given them by the ALJ and the Board, are the central issues in this case. According to the ALJ, about two weeks before the election, Janille Zirngible, a supervisor for Weather Shield, "reassured her brother, Bill Zirngible, and others whom she supervised, that, in her 'opinion,' employees would not lose benefits if the Union lost and said they might even get raises and a picnic." ALJ at 5. The ALJ found that this conversation "appropriately was described by a co-employee who had overheard it as nothing more than one of those 'brother-sister kinds of things.' " Id. The conversation apparently followed one of the company meetings concerning the vote at which Bill Zirngible "blew up" and his sister tried to calm him down. The ALJ found that there was no testimony "that [the statement] was viewed as a promise in exchange for a vote." In making these findings, the ALJ specifically credited the testimony of Janille Zirngible.
 
 
 8
 The ALJ found that Farrel Jourdan, another supervisor, "echoed management's 'no-cut' guarantees in conversations with the 75-80 employees he supervised during the week before the election." ALJ at n. 3. The ALJ also specifically credited his testimony, finding him to be "candid, forthright and reliable." Id.
 
 
 9
 Based on this evidence, the ALJ found that Weather Shield did not engage in unfair labor practices. His findings were clear:
 
 
 10
 During this 3 day hearing, I heard 18 employee and 3 management witnesses give over 600 pages of testimony. Yet I discerned no evidence of union animus in Respondent's pre-election conduct, no trace of any company effort, however subtle, to plant the seed of hope of increased wages and benefits if the Union were decertified and no other plan of threat or promise to influence the vote of its employees. What does emanate from that record is the clear feeling that the Company's intent was to do nothing during the election process (i.e. to mount a no-campaign campaign) to influence its employees in their decision to reject or retain their Union of some 30 years and that its belated campaign endeavor, provoked by a union campaign which repeatedly sought to generate fear of wage and benefit loss, was limited to making known to those employees its policies and practices at other plants where other of its employees who elected not to be represented experienced no such losses. Given the statutory right of both employers and unions to engage in promise and threat-free campaigns, it would be difficult, in a real-life workplace, to imagine an election freer of employer influence than the July 15 election conducted at this plant.
 
 
 11
 ALJ at 8.
 
 
 12
 Despite this conclusion by the ALJ, the Board found that the statements by Zirngible and Jourdan were promises of increased benefits in violation of Section 8(a)(1) of the National Labor Relations Act (the "Act"). 29 U.S.C. Sec. 158(a)(1). The Board relied on the testimony of four General Counsel witnesses who testified that Zirngible and Jourdan expressed to employees the likelihood of increased wages and benefits if the employees would decertify the Union. The Board found that "according to the uncontradicted testimony of Gary Thums," Jourdan stated that "we would probably have better insurance" if the Union were decertified. Board at 3. In addition, the Board relied on testimony of Callie Thomzcyk that Jourdan told her that "we would have a better pension plan if we would decertify the Union." Id.
 
 
 13
 As to the statements by Janille Zirngible, the Board relied on testimony of two other employees who testified that Zirngible told them that if the Union were decertified, they might get a raise. Duane Braun testified that Zirngible told him that "if there was no Union in this plant there would probably be a good chance that we would get a raise." Id. Lorraine Gengler testified that Zirngible told her a day or so before the election that " 'if there were no union that we would more than likely get a raise,' " although she presumed that this was Zirngible's opinion. Id.
 
 
 14
 In order to avoid rejecting the credibility findings of the ALJ, the Board found that "although Jourdan and Zirngible testified at the hearing, and were credited by the judge, they did not deny or contradict the remarks attributed to them by [the four witnesses]." Id. at n. 8. The Board concluded that these remarks constituted promises of increased benefits in violation of Section 8(a)(1) of the Act, and that this finding was consistent with the ALJ's credibility findings. In addition, the Board found that Weather Shield refused to bargain with the Union during the pendency of this case in violation of Section 8(a)(5) and (1) of the Act. 29 U.S.C. Sec. 158(a)(5) and (1). The Board therefore ordered Weather Shield to cease and desist from these unfair labor practices, and to meet and bargain with the Union. The Board also ordered the Regional Director to conduct a second election.
 
 
 15
 Weather Shield petitions for review of this order based on both Federal Rule of Appellate Procedure 15(a), which authorizes review of administrative decisions, and section 10 of the Act, 29 U.S.C. Sec. 160, which authorizes any party aggrieved by a final order of the Board to petition for review of such order in a Circuit Court. Weather Shield claims that the Board's conclusion is not supported by substantial evidence and, more specifically, that special scrutiny is due the Board's holding because it contradicts the ALJ's express and implied credibility findings. The Board cross-petitions for enforcement.
 
 ANALYSIS
 
 16
 Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining...." 29 U.S.C. Sec. 157. Section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), implements the guarantees contained in Section 7 by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7."
 
 
 17
 In determining whether an employer's actions violate Section 8(a)(1), the question is whether the conduct reasonably tended to interfere with or coerce employees in the exercise of their Section 7 rights. N.L.R.B. v. Berger Transfer & Storage Co., 678 F.2d 679, 690 (7th Cir.1982); Peerless of America, Inc. v. N.L.R.B., 484 F.2d 1108, 1115 (7th Cir.1973). An employer violates section 8(a)(1) of the Act by promising increased wages or benefits to employees to induce them to abandon a union. N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964); Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 685-86, 64 S.Ct. 830, 833-34, 88 L.Ed. 1007 (1944); N.L.R.B. v. Del Rey Tortilleria, Inc., 787 F.2d 1118, 1122-23 (7th Cir.1986).
 
 
 18
 While employers may not make promises as inducements to decertify a union, they may express their opinion or make factual statements. Section 8(c) of the Act explicitly provides that "the expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefits." 29 U.S.C. Sec. 158(c). "Section 8(c) is simply a recognition that an employer has a First Amendment right to communicate his views to his employees." Roper Corp. v. N.L.R.B., 712 F.2d 306, 311 (7th Cir.1983). See also N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547; Dow Chemical Co. v. N.L.R.B., 660 F.2d 637, 644 (5th Cir. Unit A, 1981). Therefore, to find a section 8(a)(1) violation while avoiding the impact of Section 8(c), the Board must have found that the statements by Jourdan and Zirngible were either promises of benefits or statements reasonably intended to coerce the employees into voting for decertification but not opinions or statements of fact.
 
 
 19
 In considering the Board's findings, we note that our standard of review is established by 29 U.S.C. Sec. 160(e). This section provides in relevant part that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. Sec. 160(e). Under this statute, a reviewing court may not reject the Board's "choice between two fairly conflicting views," but a court may set aside the Board's decision when the court cannot "conscientiously find that the evidence supporting that decision is substantial when viewed in the light that the record entirely furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 485, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951); N.L.R.B. v. Stor-Rite Metal Products, 856 F.2d 957, 964 (7th Cir.1988); Stokely Van Camp, Inc. v. N.L.R.B., 722 F.2d 1324, 1328 (7th Cir.1983) (quoting Universal Camera ).
 
 
 20
 This standard of review is not modified in any way when the Board and the ALJ disagree as to legal issues or derivative inferences made from the testimony. Universal Camera, 340 U.S. at 496, 71 S.Ct. at 468. In that situation the independent validity of the Board's order itself is still under review. Nevertheless, when the Board expressly or impliedly rejects an ALJ's demeanor based credibility determinations, the court may give the Board's order special scrutiny because the Board, unlike the ALJ, does not have the opportunity to observe the witnesses' demeanor on the stand. Id. at 493, 71 S.Ct. at 467; Stor-Rite, 856 F.2d at 964.
 
 
 21
 In considering these various elements of the substantial evidence standard, we have outlined a set of general propositions to guide our review of a Board decision:
 
 
 22
 1. In all cases, the standard of review is the "substantial evidence" standard.
 
 
 23
 2. Because the ALJ's report is a part of the record with independent significance, a factual determination of the Board that departs from the findings of the ALJ stands on weaker ground than one that does not.
 
 
 24
 3. Because only the ALJ can view the demeanor of the witnesses, any of the ALJ's findings that turn on express or implied credibility determinations take on particular significance on review.
 
 
 25
 Stor-Rite, 856 F.2d at 964. "In sum, when we review the Board's factual findings, we analyze them to ascertain whether they are supported by substantial evidence on the record as a whole, taking into account the contrary findings of the ALJ and particularly those findings that turn on the ALJ's first-hand observation of the witnesses." Id.
 
 
 26
 The first question we must address, therefore, is whether the Board rejected either the express or implied credibility findings of the ALJ. If it did, then the Board's conclusion is subject to special scrutiny rather than merely the substantial evidence test. Based on our subsequent analysis, we conclude that it did.
 
 
 27
 The Board based its conclusions on the testimony of four employees: Thums, Tomczyk, Braun, and Gengler. Thums and Tomczyk testified that Jourdan told them that they might have a better pension plan if the Union were voted out. Braun and Gengler testified that Zirngible told them that if the Union were voted out, they might get a raise. None of this testimony was credited by the ALJ. The Board, however, claims that the ALJ did not discredit it, expressly or impliedly, and that reliance on this testimony is consistent with the ALJ's conclusions. Indeed, the Board claims that it expressly accepted the ALJ's credibility findings.
 
 
 28
 We cannot agree with the Board. The Board's decision to credit the four witnesses is irreconcilable with the implied credibility findings inherent in the ALJ's factual conclusions and with the ALJ's express credibility findings. The ALJ found that there was "no trace of any company effort, however subtle, to plant the seed of hope of increased wages and benefits if the Union were decertified and no other plan of threat or promise to influence the vote of its employees." ALJ at 8. When the ALJ heard the testimony of the four witnesses relied on by the Board, he was well aware that Weather Shield would have violated the Act had it made coercive promises. And this is not a case of oversight or silence by the ALJ; it is evident from his written opinion that he was aware of the testimony relied upon by the Board. To reach the strong conclusion that he did, the ALJ, therefore, must have impliedly discredited these witnesses; otherwise he could not have found "no plan of threat or promise" or that the election was free from influence. "Universal Camera requires that the ALJ's opportunity to view and weigh the witnesses' testimony first-hand must be accorded appropriate respect. We decline to allow the Board to escape the impact of Universal Camera merely because the ALJ made the credibility determination at issue sub silentio." Stor-Rite, 856 F.2d at 967 (citations omitted).
 
 
 29
 Moreover, the Board's findings reject the express credibility findings of the ALJ. The ALJ credited the testimony of both Jourdan and Zirngible. Examination of their testimony indicates that they denied making the promises attributed to them. When asked if she ever told employees that they would get a raise if the Union were decertified, Zirngible replied "No, I did not." She went on to say, "If I said anything to anybody about money, it was my opinion that they would possibly get a raise. Possibly. I never promised any raises. I can't do that." Zirngible went on to admit that she gave her personal opinion to some of the employees that they might get a raise, but she insisted that she only gave her opinion. This is consistent with the ALJ's findings that there was "no testimony ... that [Zirngible's statements were] viewed as a promise in exchange for a vote." ALJ at 5.
 
 
 30
 Similarly, Jourdan denied ever promising increased benefits in return for decertification. He was asked "Prior to the decertification election you told Gary Thums that he would be better off working in a non-union plant, didn't you?" He replied, flat out, "No." Yet the Board relied on Thum's statement that Jourdan told him that "we would probably have better insurance" if the Union were voted out. When asked if he discussed with Callie Tomczyk what would happen if the Union lost the election, he said he "told her ... that they weren't going to lose any benefits or anything." This is simply a statement of Weather Shield's no-cut guarantee which the Board affirmed did not violate the act. Nevertheless the Board relied on Tomczyk's testimony that Jourdan said that they would have a better plan if the Union were decertified. Jourdan's testimony is consistent with the ALJ's findings that "Jourdan, likewise echoed management's 'no-cut' guarantee in conversations with the 75-80 employees he supervised during the week before the election," ALJ at n. 3, but not with the Board's findings that he promised better benefits.
 
 
 31
 To maintain its position that it did not reject the ALJ's credibility findings, the Board employed an extremely narrow concept of denial. Zirngible and Jourdan did not deny each and every word imputed to them by the Board, so the Board claims the testimony on which they rely is uncontradicted. Yet if Zirngible and Jourdan had actually made illicit promises of better benefits, then their testimony is false and misleading, a result at odds with the ALJ's determination that their testimony was "candid, forthright, and reliable." ALJ at 6. When directly asked by the General Counsel, both Zirngible and Jourdan denied making promises. Furthermore, their express denials are further substantiated by an implied one: they both explained what they did tell employees. We, therefore, conclude that the Board rejected both the express and implied credibility findings of the ALJ and subject the Board's decision to special scrutiny.[2]
 
 
 32
 Having determined that the Board rejected the ALJ's credibility findings, it is apparent that the Board's opinion is not supported by substantial evidence. The Board's findings rely almost entirely on the credibility of the four employee witnesses. If these witnesses were lying or even stretching the truth, then the Board has no evidence to support its ruling. Yet the Board's reliance on the credibility of these witnesses cannot be maintained. The ALJ both expressly and impliedly discredited the statements that the Board relies on. "The significance of the findings of the ALJ depends largely on the importance of credibility determinations to the outcome of the case at issue." Stor-Rite, 856 F.2d at 964 (citing Universal Camera, 340 U.S. at 496, 71 S.Ct. at 468.) Here, the credibility findings are dispositive.
 
 
 33
 In addition, we believe Section 8(c) protects the statements made by Zirngible and Jourdan. While the characterization of statements as promises or as coercive is a legal question for the Board and for this Court to consider, see N.L.R.B. v. Berger Transfer & Storage Co., 678 F.2d 679, 690 (7th Cir.1982); Peerless of America, Inc. v. N.L.R.B., 484 F.2d 1108, 1115 (7th Cir.1973), the fact that those who made the statements, those present when the statements were made,[3] and the ALJ who heard testimony all felt that the statements were not promises is significant. Further, Gengler and Braun both admitted in their testimony that Jourdan had simply been comparing the benefits of Weather Shield's non-union plants with those at the Millwork division which conform with the ALJ's findings. Relying on a cold record in the face of this testimony and the ALJ's strong conclusions, the Board is on thin ice.
 
 
 34
 This set of facts is remarkably similar to those in Dow Chemical, 660 F.2d at 644, which also concerned allegations of coercive pre-election statements. The Fifth Circuit considered a "friend to friend" statement by a supervisor to an employee (not under his supervision) that it was the supervisor's " 'honest, personal opinion' that the [employees] would be better off if the Union were decertified." 660 F.2d at 649. In addition, the court considered a statement by a foreman that he thought the electricians "would be better off salaried [than with the union]." Id. at 648. The court held that both these statements were protected by Section 8(c). The court reasoned that "[n]othing in the law prohibits an employer's representatives in an election campaign from stating, in a setting free from coercion, their opinion or belief that voters would be better off if they voted to decertify." Id. at 650. See also Roper Corp. v. N.L.R.B., 712 F.2d 306, 311 (7th Cir.1983); N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969); Walgreen Co., 203 NLRB 177 (1973). In the present case, we have a supervisor who stated that in her opinion the employees would be better off without the union and a supervisor who compared the benefits at Millwork with those at a non-union plant. Their comments are on the same scale as those in Dow Chemical. In addition, like Dow Chemical, there is little evidence that any of the statements were perceived as promises. We conclude that both Zirngible's statements and Jourdan's statements fall well within the ambit of Section 8(c) as either statements of fact or opinion.
 
 
 35
 The Board's order must be based on a reading of the record as a whole. While the Board can find in the transcript single sentences that appear to give some support to their position, these statements are taken out of context and do not support the Board's position when read in light of the entire record. The discussion of the testimony above indicates that the statements were merely personal opinion or statements comparing union benefits with benefits available at non-union plants. Moreover, the Board points to no cases where similar statements made in a similar context were held to violate Section 8(a)(1).[4] As observed by the Fifth Circuit in Dow Chemical:
 
 
 36
 It is not sufficient that bits and pieces of statements may be later lifted out of context, that the facts and circumstances under which the statements were made and which were known to the employer/employees may be ignored, and that these bits and pieces may then be viewed in vacua as either promises or non promises.
 
 
 37
 660 F.2d at 644.
 
 
 38
 We conclude that the Board's opinion is not supported by substantial evidence as viewed under special scrutiny. The Board's opinion relies entirely on the credibility of the witnesses while simultaneously, despite its statements to the contrary, rejecting the express and implied credibility findings of the ALJ. In addition, the statements on which the Board relies are protected by Section 8(c) of the Act as statements of opinion or of fact. Finally, the Board read these statements out of context and failed to examine them as part of record as a whole. Therefore, we conclude that the Board's order is not supported by substantial evidence on the record and accordingly we deny the Board's petition for enforcement.[5] Under the power granted to this Court in 29 U.S.C. Sec. 160(f), we set aside the order of the Board and direct the Board to certify the July 15, 1982 decertification election.
 
 CUDAHY, Circuit Judge, dissenting:
 
 39
 This case poses the longstanding problem of what happens when ALJ and Board disagree and the elusive and easily manipulable role of "credibility determinations" in this calculus. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951); Kopack v. NLRB, 668 F.2d 946, 953 (7th Cir.), cert. denied, 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982); Richmond Recording Corp. v. NLRB, 836 F.2d 289, 295 (7th Cir.1987). Here the Board has been at some pains not to disturb what it identifies as the ALJ's credibility determinations. And the majority has gone to some lengths to invalidate the Board's efforts by recourse to what it identifies as "implied" credibility determinations. To put the Board determination in a perhaps more understandable perspective, we should note that the General Counsel and the Union had argued that the ALJ's conduct had created the appearance of prejudgment and partiality:
 
 
 40
 The General Counsel argues that the judge interfered with her ability to elicit testimony by his practice of questioning witnesses. She also contends, and the records show, that the judge interrupted the General Counsel's examination of witnesses and invited the Respondent's counsel to move to strike certain testimony. The General Counsel further asserts that the judge's decision ignores the record, maligns the Union, and improperly resolves credibility issues because of prejudice and bias. Our review of the record reveals that some of the judge's remarks and behavior could well be interpreted as disparaging the General Counsel and the Union. Although we do not condone the judge's conduct, the record as a whole is insufficient to establish bias.
 
 
 41
 292 N.L.R.B. No. 1, Board Decision at 2 n. 3 (1988).
 
 
 42
 The Board rejected the General Counsel's motion, based on the alleged bias of the judge, for a hearing de novo before a different administrative law judge. Nonetheless, the Board gave some credence to the charges and certainly these at least demonstrate that the ALJ had not been reticent in expressing his views of the parties and, presumably, other matters. It is therefore unwarranted to ascribe to him "implied" credibility determinations. If he thought a witness was not telling the truth, he was entirely capable of saying so with utmost clarity and precision. In order to identify a more elusive kind of "credibility finding" (and to assert thereby that the Board rejected the ALJ's findings), the majority relies heavily on the ALJ's general "findings," which are indeed so panglossian as almost to engender skepticism. Thus, the ALJ said at one point that there was "no trace of any company effort, however subtle, to plant the seed of hope of increased wages and benefits if the Union were decertified and no other plan of threat or promise to influence the vote of its employees." Id., ALJ Decision at 8. At an earlier point he said, "... I discerned no evidence of animus in [the company's] pre-election conduct...." Id. That there should be no ill-feeling ("animus") in the context of decertifying a union of almost thirty years standing seems to me almost too good to be true.[1] Nor is such an attitude exactly congruent with the company's post-election dropping of the union and the collective bargaining process like a hot potato.
 
 
 43
 In any event, the ALJ did not reject the reports by employees Thums and Tomczyk of statements by General Foreman Jourdan nor the reports by employees Braun and Gengler of statements by Supervisor Zirngible. The reporting employees underwent direct examination and cross-examination based in part on informal post-election interrogations by company counsel. Since they were mill workers and not law graduates, they may not have mastered the subtle distinctions between "promises" and "opinions," not to mention "predictions" and "expectations." But their testimony seems honest if not sophisticated and was not rejected by the ALJ. It certainly supplies substantial evidence upon which the Board might base a conclusion. Expansive rhetoric about the company's benevolent outlook on a union decertification election does not seem to me an adequate substitute for specific discrediting of testimony if the latter is intended. I agree with the Board that the ALJ did not discredit the testimony of the four employees; nor did the Board for its part have to reject the ALJ's finding that Zirngible's and Jourdan's testimony was in its turn "candid, forthright, and reliable."
 
 
 44
 What the majority does not explore is the distinct possibility that the Weather Shield officials believed that their statements did not amount to "promises," while Weather Shield employees heard and understood these very same statements as "promises"--that is, as reliable forecasts of events, attributable to the company. In the tense atmosphere of a decertification election, this hypothesis seems not implausible, but the majority does not address it.
 
 
 45
 In its landmark Gissel Packing Company decision, the Supreme Court recognized that an employer need not make an express promise or threat before it will be interpreted by employees as such:
 
 
 46
 Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in Sec. 7 and protected by Sec. 8(a)(1) and the proviso to Sec. 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more easily dismissed by a more disinterested ear. Stating these obvious principles is but another way of recognizing that what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent....
 
 
 47
 NLRB v. Gissel Packing Co., 395 U.S. 575, 617-18, 89 S.Ct. 1918, 1941-42, 23 L.Ed.2d 547 (1969) (emphasis supplied). Thus, I cannot agree with the majority's conclusion that what the officials say they told the employees--and what the employees indicate they heard and understood--are necessarily contradictory. The Board's decision to credit the testimony of the four employees, then, does not amount to a rejection of the ALJ's credibility findings.
 
 
 48
 Further, as an objective matter, there is substantial evidence that the officials' statements constituted promises in violation of the Act. Zirngible and Jourdan indicated that employees would get a better insurance plan, a better pension and even a raise if the decertification election succeeded, and these comments were disseminated to others. Weather Shield's insistence that plant superintendent Alvord Selk disavowed any promises made by its officials is also instructive; his statements that "[t]he company cannot promise, threaten or interrogate" may have done little to dissuade employees that the company actually did not promise increased benefits. Combined with the closeness of the vote (a change of 7 votes out of 233 would have been sufficient to retain the union), "the whole record" indicates that substantial evidence supports the Board's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). At the very least, I believe that the majority has impermissibly displaced "the Board's choice between two fairly conflicting views." Id.
 
 
 49
 If the Board's view and the ALJ's opinion are equally supported by substantial evidence, the Board's view, of course, prevails. The burden is on the petitioner to show that the Board order is not supported by substantial evidence. That burden has not been met.
 
 
 50
 I therefore respectfully dissent.
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 The ALJ's opinion is appended to the Board's decision which is published at 292 N.L.R.B. No. 1. We will refer to these decisions as Board at ---, and ALJ at --- with the page numbers referring to the appropriate page in the slip opinion
 
 
 [2]
 The Board argues that its findings were simply derivative inferences drawn from the record. The Board is free to reach its own "derivative inferences" on legal questions as distinguished from "testimonial inferences" reserved for the ALJ. See Kopack v. N.L.R.B., 668 F.2d 946, 953-955 (7th Cir.1982), cert. denied, 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982). Here the Board is making testimonial inferences as the Board must overturn the ALJ's credibility findings in order to reach its conclusion
 
 
 [3]
 Only one of the four witnesses (Tomczyk) unequivocally stated that she understood the supervisors' statements to be promises. Gengler and Thums admitted that they thought the statements were not promises. Braun stated on direct examination that he thought they were promises yet said on cross-examination that in earlier interviews with council he had stated that he thought otherwise. The Board can point to only one employee out of 233 who claims to have understood Weather Shield's statements to be promises
 
 
 [4]
 The cases cited by the Board as support for its position that these statements were coercive are not apposite. See N.L.R.B. v. Drives Inc., 440 F.2d 354, 359-60, 363-64 (7th Cir.1971), cert. denied, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971) (survey distributed to employees requesting suggestions for improvements in working conditions and letter and statement that employer intended to make improvements consistent with its financial ability to do so); Grandee Beer Distributors, Inc. v. N.L.R.B., 630 F.2d 928, 930-32 (2d Cir.1980) (manager stated that he was working on health and sick leave plans); N.L.R.B. v. Garry Mfg. Co., 630 F.2d 934, 942-44 (3d Cir.1980) (supervisor informing employees that union could not promise any more wages than he could). None of these cases concern statements by employers that were regarded as opinion. In addition, each of these cases involved a fairly explicit promise rather than merely a statement that wages and benefits might be "better" if the union were decertified
 
 
 [5]
 The final issue concerning Weather Shield's failure to bargain with the Union during the pendency of this case is moot based on our holding. Accordingly, we need not reach the appropriateness of the Board's order to bargain with the Union for the time period representing those seven years in which the case was pending
 
 
 [1]
 Supervisor Zirngible testified, "I just felt that if the Union was voted out Lee Shield [the company president] would be happy that it was voted out because he is, he doesn't like unions." Tr. 149